**UNITED STATES v. CURTISS AERO-
PLANE CO. et al.**

**No. 24.**

Circuit Court of Appeals, Second Circuit.

Jan. 8, 1945.

Rehearing Denied Feb. 3, 1945.

Paul A. Sweeney, of Washington, D. C., Francis M. Shea, Asst. Atty. Gen., and Daniel M. Sandomire, Alexander N. Sack, and Lester S. Jayson, Sp. Assts. to the Atty. Gen., of counsel), for appellant.

Kenneth M. Spence and Soia Mentschikoff, both of New York City (Spence, Windels, Walser, Hotchkiss & Angell, of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a summary judgment dismissing its complaint, because it was barred by the Statute of Limitations. The facts are as follows: Between September 25, 1914, and February 25, 1915, the Russian Imperial Government made seven written contracts with a corporation known as the Curtiss Aeroplane Company, for the manufacture and delivery of forty-eight "K boats," and two transatlantic "flying boats." (The other defendants have succeeded to the liabilities

of the Curtiss Aeroplane Company, but for simplicity we shall disregard them, and dispose of the case as though the Curtiss Aeroplane Company were the only defendant.) The Curtiss Company had delivered the forty-eight "K boats" before the end of July, 1915, with the exception of certain accessories and spare parts, which it shipped on September 30th and October 12th of that year. The two "transatlantic boats" it shipped from its factory on April 1, 1916. After the "K boats" arrived, the buyer asserted that they were defective, and that the Curtiss Company had failed to comply with its warranties as to their performance. On August 3, 1915, it asked the company to replace the motors, which the company tried to do, but was unable to before the freezing of the northern ports (those being the only ones open at the time, because of the war). On March 7, 1916, the buyer told the company's local representative in Petrograd that it meant to sue; and on April 29th it gave notice to remove the "K boats" from the premises. Thereafter there were various negotiations for settlement through the summer and fall of 1916; but nothing had been concluded when the Imperial Government was succeeded in March, 1917, by the Provisional, or Kerensky, Government, which in its turn gave place to the Soviets in the following November. As is well known, the United States continued to recognize the Provisional Government, and its ambassador, Bakhmeteff, on March 15, 1922, entered into a contract with the Curtiss Company, the important parts of which were as follows:

"1. Russia shall not commence an action against the Company and the Company shall not present a claim against Russia until after the expiration of two (2) years after the Government of Russia recognizes and accords full honor in Russia to passports issued by the Government of the United States to American citizens desiring to travel in Russia in connection with ordinary commercial enterprises.

\* \* \* \* \* \*

"2. In the event that after the expiration of such two year period Russia shall commence an action against the Company or the Company shall present a claim against Russia, the defending party to such action or claim shall not plead or set up as a defense as a part of any statute or limitations the period of time intervening between March 15, 1922 and the end of a period of five years following the expiration of such two year period."

The Soviet Government, as successor to all rights of the Imperial, and of the Provisional, Governments, assigned all seven causes of action to the United States as of November 16, 1933, and the United States commenced this action on April 9, 1941. The defendants answered on September 15, pleading the Statute of Limitations; and on October 5, 1942, they moved for a summary judgment dismissing the complaint, as barred by section 48 of the New York Civil Practice Act. Both sides agree that, after November 16, 1933, the Soviet Government recognized and accorded "full honor in Russia to passports issued by the \* \* \* United States to American citizens desiring to travel in Russia in connection with ordinary commercial enterprises." We understand that the defendants also agree that after November 16, 1933, no time ran against the plaintiff; in any event, there is no doubt about it, and the only question open on this appeal is whether on that day the statute was a bar to an action by the Provisional Government in this country.

The meaning of the contract of March 15, 1922, is plain; the promise not to plead the statute was supported by the buyer's promise to forbear, which it performed. The defendants answer, however, that the seller's promise was invalid because the law of New York—which everyone agrees to be controlling—does not allow a promisor to promise not to plead the Statute of Limitations: it is the "public policy" of that state that actions shall be brought within the periods prescribed; promisors are not to be allowed to expose themselves to the hazards which longer delays will entail. When such a stipulation is made a part of the very contract out of which the obligation arises, there are indeed decisions in New York—as there are in other jurisdictions—which support that position. Crocker v. Ireland, 235 App. Div. 760, 256 N.Y.S. 638; Pine v. Okoniewski, 256 App.Div. 519, 11 N.Y.S.2d 3; Mutual Life Insurance Co. v. United States Hotel Co., 82 Misc. 632, 144 N.Y.S. 476. Moreover, although the foregoing are the only actual decisions upon the point that we have found, in Watertown National Bank v. Bagley, 134 App.Div. 831, 119 N.Y.S. 592; St. Andrews Parish v. Gallagher, 121 Misc. 167, 169, 200 N.Y.S. 590; Anglo California Nat. Bank v. Klein, 162

Misc. 898, 906, 296 N.Y.S. 191; and Gorowitz v. Blumenstein, —— Misc. ——, 53 N.Y.S.2d 179, it appears to have been assumed that such is the law of the state; as we too shall assume for the purposes of discussion. With that as a basis, the defendants argue that there is no distinction between a stipulation in the original contract and in a later contract, based upon independent consideration. At first blush this may seem true, but on scrutiny valid distinctions do emerge. Any extension of the period of limitation is in the interest of the promisee alone, when the contract is first made: the due date is one thing, he may wish that to be accelerated, but the longer he can wait thereafter, the greater his opportunity to choose the most propitious time to collect. That is a one-sided advantage, and it can be argued that it should not be in the power of the promisee to exact even a limited extension, since the borrower is apt to be in an inferior economic position. That was the rationale of Forbach v. Steinfeld, 34 Ariz. 519, 273 P. 6 and First National Bank v. Mock, 70 Colo. 517, 203 P. 272, 21 A.L.R. 770. See also 30 Col.L.R. 383, 391; 45 Harv.L.R. 592, 593. Courts have divided upon the question, however, even when the promise is for a definite and reasonable extension; though it is probably invalid in most jurisdictions, when the extension is indeterminate. Williston, § 183. Be this as it may, as the period of limitation approaches its end, the situation is likely altogether to change, and it may become to the interest of the promisor to be able to make a valid contract not to plead the statute. It may be vital to him that he shall not be sued at that time; a judgment may be ruinous. And even though the promisee sues and the case is continued, the mere pendency of the suit may prejudice him. Moreover, it is hard to see why, if the parties may continue the suit as long as they choose, they should be forbidden to agree that no writ shall be served. So far as the "public policy" of the statute depends upon the staleness of the evidence at the eventual trial, there is no difference whatever between the two courses. Nor is it an escape to say that the promisor can always acknowledge the debt; he may wish to contest it on the merits, and his acknowledgment—probably in New York as elsewhere—must be unconditional. Unless he and the promisee can make a valid contract, the promisee will be forced to sue at once, and the statute, which is primarily for the promisor's protection (State Trust Co. v. Sheldon, 68 Vt. 259, 35 A. 177), may prove his undoing. Indeed, the promisee too may have an interest in further delay, for he also may think that the promisor will be better able to pay later. Thus, whatever may be said for the "public policy" which forbids such a stipulation in the original contract, there is certainly a valid distinction between it and a later contract.

There is nothing in the "public policy" of the statute, or in the New York decisions, to support the notion that such a contract, at least when it is in writing, is invalid. Section 59 of the New York Civil Practice Act enacts the common-law doctrine that a promise to pay a debt or its acknowledgment, whether or not it is already barred, creates an actionable obligation, although it adds the condition that it must be in writing. We can think of no reason why a promisor should be permitted so to extend the period of limitation against himself, and even to revive a barred debt, which does not apply with equal force to validate an agreement not to plead the statute. Indeed, if a conditional acknowledgment were enough, there would be no difference at all; and, although, as we have just said, probably it is not enough, there is some question even as to that. In Van Schaick v. Metz, 244 App.Div. 719, 279 N.Y.S. 988, for example, the court held an acknowledgment to be valid under section 59, though it was nothing more than a promise not to plead the statute. The court below relied upon Woods v. Board of Supervisors of Madison County, 136 N.Y. 403, 32 N.E. 1011, and it was true there also that the acknowledgment was not unconditional—at least in amount. The defendants insist, and the judge agreed, that these cases are contrary to the general doctrine in New York, and perhaps they are right. Connecticut Trust & S. D. Co. v. Wead, 172 N.Y. 497, 65 N.E. 261, 92 Am.St.Rep. 756; Zinn v. Stamm, 152 App.Div. 76, 136 N.Y.S. 737; Lincoln-Alliance Bank & Tr. Co. v. Fisher, 247 App.Div. 465, 286 N.Y.S. 722; In re Povill, 2 Cir., 105 F.2d 157 (construing § 59). Even so, and assuming that the acknowledgment must be unconditional, to distinguish between it and a contract not to plead the statute adds nothing to the promisor's protection. If he can abandon all

defenses, including that of the statute, how does it help to deprive him of the power to abandon the defence of the statute alone? Finally, it cannot be that statutes of limitation are in any degree for the purpose of relieving courts of the trial of issues which have become hard to decide by the loss of evidence. Courts are maintained to settle disputes, however the parties may embroil themselves; it would be a strange doctrine which forbad people to deal with their affairs as they wish, lest the judges should be unduly vexed. As res integra, we should therefore have no doubt that the contract was valid; and we will address ourselves to the New York decisions.

In Shapley v. Abbott, 42 N.Y. 443, 1 Am. Rep. 548, Shapley held a note of Abbott which had been due for nearly six years, but he owed a firm of lawyers, of which Abbott was a member, for a bill of costs. The balance of these costs he offered to pay, if Abbott would let him set off the note. Abbott refused, because the costs belonged not to him but to his firm; and Shapley then replied that the note would "outlaw soon, and something must be done about it." To this Abbott answered: "if the note did outlaw he would not plead the statute of limitations on it," and in reliance upon this promise Shapley let the statutory period expire. The Court of Appeals by Earl, C. J., upheld Abbott's plea of the statute. First, the Chief Judge said that, although Abbott's promise was a good "acknowledgment" of the debt and would have tolled the statute before the then recent amendment, yet, since it had been oral, it was invalid. Second, he said that, although Shapley had acted upon the faith of the promise, there had been no consideration, for Shapley "did not agree with the defendant that he would wait and permit the note to outlaw. Neither could he rely upon what then took place as a waiver by the defendant of the statute of limitations, because there was no consideration to uphold the waiver. The defendant did not then have the right to plead the statute, and this was at most a mere promise to waive it." 42 N.Y. at page 447, 1 Am.Rep. 548. That statement was in accord with the law of consideration seventy-five years ago; Shapley had not promised to forbear, nor was Abbott's promise not to plead the statute made in exchange for Shapley's forbearance. Our theories of consideration have now changed, and we should today regard Shapley's reliance upon Abbott's promise as good consideration by "promissory estoppel" (Restatement of Contracts § 90), but we must not read this back to 1870.

The Chief Judge could therefore find nothing on which to support Shapley but the possibility of an "estoppel," and the rest of his opinion—by far the greater part—was a discussion of that question. "Estoppel" he defined in the classic sense: i.e., the statement of existing fact on which the other party relied. After accounting for the specific performance of contracts for the sale of land as cases of "fraud," and mentioning the power of a promisor of his own accord not to plead usury, or the Statute of Frauds, or the Statute of Limitations, or an exemption from execution, he concluded: "but no case has occurred to me in which a party can, in advance, make a valid promise that a statute founded in public policy shall be inoperative." 42 N.Y. at page 452, 1 Am.Rep. 548. The phrase, "in advance," is a little obscure; but, if it includes a promise made at any time before the claim is barred, and if the language is broken from its setting, possibly it gives color to the defendants' position; though it would still be a gratuitous statement having no bearing on the actual decision. But even as dictum, the discussion of the authorities which followed shows that it should not be so read. The Chief Judge first considered two Maine decisions: Warren v. Walker, 23 Me. 453, and Hodgdon v. Chase, 29 Me. 47; Id., 32 Me. 169. In the first of these, on the eve of the expiration of the promisee's time to sue, the promisor had in writing declared: "I hereby waive all defence * * * under and by virtue of any statute of limitation." The court thought this insufficient as a new promise or acknowledgment, but a good answer to the bar of the statute, because it was an implied promise not to plead it, supported by a consideration. The ground on which the Chief Judge distinguished the case, which was on all fours with the case at bar, was particularly significant. "Unlike the case we are considering," the promisor was held to have been bound, because "there was a *consideration proved for this agreement*." (Italics in the original.) In the second and third decisions the agreement had been oral, and that was the ground of the decision. The Chief Judge discussed these decisions, not, so far as appears, to disapprove them, but

to distinguish them. The next case he discussed was Webber v. President, etc., of Williams College, 23 Pick., Mass., 302, where Chief Justice Shaw upheld an agreement not to plead the statute for a year on the ground "that it is a good waiver of the statute of limitations." This result the Chief Judge explained on the ground of a valid acknowledgment; he objected to putting it on the ground of "waiver." If by that he meant that a later written contract not to plead the statute was invalid, it was in complete contradiction of the way in which he had just treated the law of Maine. The next case was Utica Insurance Co. v. Bloodgood, 4 Wend., N.Y., 652; a case which also involved a subsequent written agreement not to plead the statute, but which was sustained on the ground of "estoppel." The Chief Judge disapproved all talk of "estoppel," and put the result upon a sufficient acknowledgment of the debt. Again, we are at best left in entire doubt that he meant to go farther than to disapprove of "estoppel." In Gaylord v. Van Loan, 15 Wend., N.Y., 308, the next case he took up, the promisor had said: "If you prove I owe you anything, I will pay you." This was after the statute had run against two of the notes; and the court held that the promisor's statement was not a promise within the statute to pay the notes, but that he might be "estopped" as to the third note. Once more, it was at this use of "estoppel" that the Chief Judge winced. The case is wrong in any view because there was no consideration for the promisor's promise, in the sense that consideration was then understood. The last case he discussed was Brookman v. Metcalf, 27 N.Y.Super.Ct. 568, 4 Rob. 568, where the promisor had agreed that if endorsees of the promisee would suspend bringing action, he would abide by a decision in another case then pending: "influenced by such offer, the plaintiffs delayed bringing an action"; and this was held to be an "equitable estoppel, or estoppel in pais." The promise wsa oral, and the Chief Judge seems to have thought if it had not been, it would have been a sufficient acknowledgment (42 N.Y. at page 455, 1 Am.Rep. 548); his disapproval was apparently only because it had not been in writing. Thus it appeared that throughout it was only with the notion of what we now call "promissory estoppel" that he had any quarrel; and that when there was a promise supported by what was then regarded as valid consideration, as in Maine, he apparently accepted it as good law that it was valid. Justice Sutherland, who also wrote an opinion, put himself squarely on Judge Selden's opinion in Crawford v. Lockwood, 9 How. Prac., N.Y., 547, 550, 551, which dealt with a waiver of exemption contained in a negotiable note. His discussion also turned upon "estoppel," viewed as a misstatement of fact.

We have examined the decision in Shapley v. Abbott, supra, 42 N.Y. 443, 1 Am. Rep. 548, at length, because it is the sheet anchor of the defense in the case at bar. It appears from what we have said that it does not support them, certainly not in decision, and not in dictum when properly understood. It left untouched the validity of a later written contract, founded upon good consideration, in which the promisor promised not to plead the statute for a limited time. Several times since then New York courts have upheld such agreements upon the discredited theory of "estoppel"; curiously enough, none of them mention Shapley v. Abbott, supra, 43 N.Y. 447, 1 Am.Rep. 548. In Hobart v. Verrault, 74 App.Div. 444, 77 N.Y.S. 483, the promisor had written that a note should not be good till after her death; a majority held that this "estopped" her executor. The intent seems, however, to have been that it was the payment that was to be suspended, not any action upon the promise after it became due. The decision is in any event difficult to understand. In Andrews v. Cosmopolitan Bank, 183 App.Div. 787, 171 N.Y.S. 875, a mere resolution of the promisor's board of directors "waived" the statute; no reason was given; no authorities cited. In re Sanford, 95 Misc. 3, 160 N.Y.S. 209, and In re Williams' Estate, 121 Misc. 54, 200 N.Y.S. 222, both went on "estoppel." In spite of the especial deference which we must give to any decision of the state courts upon state law, we should hardly suppose that we ought to prefer this body of authority to Shapley v. Abbott, supra, 42 N.Y. 447, 1 Am.Rep. 548, so far as it is in conflict with it. We are not forced to depend upon them, however, for Watertown National Bank v. Bagley, supra, 134 App.Div. 831, 119 N.Y.S. 592, and Gorowitz v. Blumenstein, supra — Misc. —, 53 N.Y.S.2d 179, both flatly decided that such contracts are valid. In the second, Shientag, J., analyzed all the authorities and left little, if anything, more to be said. The defendants seek to distinguish his deci-

sion, because he preferred to go upon the ground that, although, when the promisor promises not to plead the statute for an indefinite time, it may be invalid, the promise before him could be construed as extending the period only for a reasonable time, which the promisee had not exceeded. We share his doubt as to the validity of an indefinite extension; but it is a doubt which we need not lay in the case at bar. The period of suspension in the contract of March 15, 1922, was by no means unreasonable. The issue of the planes' performance was likely to be decided chiefly by Russian testimony; certainly the Curtiss Company could not be expected to prepare for trial without sending agents to that country, who should have entire freedom while there. Indeed, the correspondence preceding the contract shows that it was on the particular insistence of the company that this provision was inserted; and we cannot say that two years was too short a time within which to prepare for trial after Russia was open. It is of course true that the controversy has now become incredibly stale; but we must carry ourselves back to 1922. The action could not be tried at all until we recognized the Soviets: when we did, they would have all the evidence, and the Curtiss Company would be greatly handicapped to rebut it. That company can with little grace now complain that the forbearance it then procured was unnecessary or unreasonable, when by it alone it will be enabled to make such preparation as the passage of time still leaves open. Finally, although the difficulties have no doubt prodigiously mounted, it is probable that they have mounted on both sides, and the plaintiff has the burden of proof.

■ Nor is there any merit in the point that any suits on the contracts for the "K boats" had been already barred before March 15, 1922. In the first place upon a motion for summary judgment we cannot tell when the five rights of action accrued. But it would probably make no difference, though it appeared that they had accrued before March 15, 1916. While it will at times be true that after an action has in fact become barred, the promisee's forbearance will not be consideration for the promisor's promise not to plead the statute, that is not the case when there remains, as there

usually does, an honest controversy as to whether the right of action was barred when the later contract was made. If there was such a controversy in the case at bar—certainly if it had any reasonable basis—forbearance by the promisee was good consideration, regardless of whether the action had been actually barred or not. We will not, however, finally decide the question now; indeed, we should not upon an appeal from a summary judgment. It is perhaps conceivable—though it seems scarcely more—that on March 15, 1922, no one could have honestly and reasonably believed that the five actions were not already barred. We leave it open to the defendants to prove so, if they can.

We have not discussed another reply which the plaintiff makes to the defense. It says that, even though we were to hold that the promise not to plead the statute was invalid, nevertheless, the promise of the Provisional Government to forbear bringing suit tolled the statute while it was in force. The time so taken out not being counted, the action was not barred on November 16, 1933, if it had not been already barred on March 15, 1922. Since the considerations which control with respect to that defense are essentially the same as those we have already discussed, no separate discussion is necessary.

Judgment reversed; cause remanded for trial on the merits.

## On Petition for Rehearing.

### PER CURIAM.

■ We did not mean to pass upon whether the claims upon the contracts for the "K boats" were, or were not, already barred on March 15, 1922; or to pass upon whether the contract of that day revived them, if they were already barred. All we decided was that if they were barred and that if the contract intended to revive them, there was good consideration. Upon the trial we leave it open whether these claims were barred, and what effect, if any, the contract of March 15, 1922, had upon them, if they were. We agree with the District Judge that those issues involve questions of fact which should not be decided upon motion for summary judgment.

Petition denied.